# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00557-CV

---

**D. M., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 424TH DISTRICT COURT OF BURNET COUNTY**
**NO. 49494, THE HONORABLE J. ALLAN GARRETT, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

D.M. (Father) appeals from the district court's order terminating his parental rights to his daughter K.M., who was born in May 2016.[1] We affirm the termination order.

## STANDARD OF REVIEW

To terminate a parent's rights to his child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the

---

[1] For the child's privacy, we refer to her by her initials and to her family members by their relationships to the child. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The hearings before the associate judge and the district court were held via video conference. *See* Court Procedures for Coronavirus (COVID-19), Child Protection Court of the Hill Country, updated and signed Feb. 28, 2021.

trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we do not ignore undisputed evidence contrary to the finding but otherwise assume the factfinder resolved disputed facts in favor of its finding. *Id.* at 630-31. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against all the evidence favoring the finding and ask whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.*

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

2

## PROCEDURAL AND FACTUAL SUMMARY

In May 2019, the Texas Department of Family and Protective Services sought and obtained emergency conservatorship over K.M., who was three years old at the time. It attached to its petition an affidavit by Department caseworker Michael Conner, who alleged that in October 2017, eighteen-month-old K.M. was found screaming in Mother's apartment after Mother had gone to work. Father was lying unresponsive in bed, trash littered the floor, and a knife, drug residue, and drug paraphernalia were accessible to the child. Mother admitted to smoking marijuana regularly and tested positive for marijuana; Father admitted that he was a regular user of methamphetamine and had used it the day before the incident and tested positive for marijuana and methamphetamine; and K.M. tested positive for methamphetamine. The family was referred to a family-based safety services (FBSS) case that concluded in July 2018. K.M. remained with Mother, and they moved in with Mother's mother.

In March 2019, the Department received a referral for neglectful supervision after Mother had a car accident—K.M. was in the car but not restrained, drugs and drug paraphernalia were found in the car, Mother admitted to smoking marijuana before driving, and Mother and K.M. both tested positive for marijuana. Mother and K.M. moved in with Mother's father (Grandfather) and stepmother (Grandmother), and the Department put into place a safety plan under which Grandfather and Grandmother would supervise Mother and ensure that she did not use illegal substances while with K.M. In early May, Grandfather was arrested after an incident in which he threatened to hurt himself after he had been drinking. In a family meeting following that incident, Mother admitted that she had returned to heavy marijuana use within a month of finishing her 2018 FBSS case and that she smoked marijuana every night after K.M. goes to sleep. She was unable to say anything she had learned from the FBSS case, and Conner said

3

Mother "has shown that [the earlier case] didn't help her with her illegal drug use and she started back within a month of completing services. Now her 3 year old child is positive for marijuana." Conner also averred that Mother has been diagnosed with bi-polar depression, anxiety, and posttraumatic stress disorder and takes medication nightly for those conditions.

After the Department was granted temporary emergency conservatorship, K.M. was placed with Grandfather and Grandmother, where she remained through the proceeding. Mother and Father, who was in prison until April 2020, were placed on court-ordered service plans. In early October 2020, shortly before a final hearing before the associate judge, the parties attempted a mediation. The record reflects that Father did not appear for the mediation and that therefore no agreement was reached as to him, but that the Department, Mother, Grandmother, and Grandfather reached a mediated settlement agreement that applied to them.

At a hearing on October 6, 2020, the associate judge heard testimony by Father, Mother, Department caseworker Beverly Williams, and Grandmother. Father testified that he was arrested for robbery in June 2018 and released on parole in April 2020. Father said that he had not met with the family's caseworker, that she had not talked to him about his service plan, and that "[a]ll she told me I had to do was drug test and counseling." He later testified that he had taken a parenting class while in prison and acknowledged that he had been ordered to pay child support and undergo a psychological evaluation. Father admitted that he had not paid any child support, saying, "To be honest, I ain't got no—no explanation why," and later adding that he was trying to save money to move into his own home. He also admitted that he did not complete the psychological evaluation, saying the Department was "supposed to schedule the appointment" but never told him anything further about it. Father testified that he did not know he had been ordered to take an anger management class.

4

Father said that he attended three therapy sessions via telephone in July and early August 2020. He was discharged unsuccessfully in August for no-shows, explaining that he lost his phone in August and admitting that he never called the therapist to reschedule. Father said, "The first time [the therapist] had called me was on a Wednesday when I was supposed to call my daughter, and I told him I wasn't able to do Wednesdays 'cause I talk to my daughter on a Wednesday," and, "So he told me to come in next week, and I had lost my phone, and I just—it slipped my mind, and I ain't going to lie to you."

Father denied using drugs in front of K.M. but admitted using them while K.M. was in the home. He acknowledged that K.M. had tested positive for methamphetamine in 2017 but insisted that he never used it in her presence and that her positive test was instead caused by "skin to skin," "[t]hrough pores, the pores of the skin." Father had only taken one drug test for the Department, which was negative, but said that he also takes a test every other week to meet his parole conditions. At the time of trial, however, he had not yet signed a release form to allow the Department access to his parole information even though he saw his parole officer twice a month. The associate judge reminded Father that he had been ordered on July 7 to "sign a release for the Department to talk to your parole officer" and asked why in the "six, seven times you've seen your parole officer, how come you haven't been able to get them to sign a release for [the Department] to be able to talk to—to your parole officer," and Father responded, "I forget when I get there. I'm usually in a rush so I can get back to work."

Father had last seen K.M. in person while he was still in prison—Mother initially brought K.M. to see Father in prison "a lot," but stopped in February 2019. Since his release, Father was supposed to have a videocall with K.M. for fifteen minutes every Wednesday, and he testified that he had made most of those calls but had missed about three because he was

"[w]orking late, tired." Father had also been granted weekly in-person visitations but had not arranged for any such visits. He said his parole officer told him he could go "but it will be best if I just wait to get my ankle monitor off 'cause I should have it off by next week." Asked whether he could have gotten permission from his parole officer, Father said his parole officer "don't even answer for" the Department caseworker. He further asserted that his attorney did not provide any help and instead told Father to call the caseworker. Although he admitted he had not written K.M. letters or drawn her pictures, he maintained that his efforts to establish a bond with the child had been limited to weekly calls by the Department.

Father believed it was in K.M.'s best interest to maintain his parental rights because, "I'm her father. I've done changed a lot. It's not like I'm the same ol' person anymore." He explained that he was sober and employed as a welder, had a "better attitude," and had calmed his anger. Asked where "the best place is for" K.M. as of the day of the hearing, he responded, "With her father." His plans for K.M. were to "[g]ive her the best life. Make up for everything I've done wrong to her." He testified that he was currently living in his grandmother's four-bedroom house with his grandmother and his two sisters, that K.M. could sleep in his room, and that he was looking for his own place to live. Father explained that his grandmother or older sister could watch K.M. while he worked.

Father testified that he had been jailed about two years earlier for domestic violence but said that the charge had been dismissed. He was asked about a recent allegation by Mother that he had held her down while his sisters beat her and insisted that the allegation was untrue. Instead, he said, he had stopped his sisters and "[t]hat's why I was holding [Mother] down, and then I let her go and she started hitting on me and everything." He also testified that Mother's mother was there and "told me to hold her down until the cops got there."

6

Beverly Williams, the family's caseworker, testified about the 2017 incident in which Mother's landlord called the Department:

> My understanding of that occurrence was that [K.M.] was in the apartment with her father. I believe it was the landlord or my observation of the writings was the landlord heard her screaming and unlocked the door, and [Father] was unresponsive on the couch and that she was running around in her diaper. They called the police, and when they got there, there was—there was a white film on the tables. There was no food in the house except for ramen. There was a knife on the counter or the table and access where [K.M.] could get to it, and he was just unresponsive the whole time, but that's where they found her.

She further said that there was "white powder on the table, the bong, just drug paraphernalia, beer cans"; that "it was just a mess in there"; and that the apartment "[s]melled like human feces." Father and K.M. both tested positive with "high levels of methamphetamine," and Mother tested positive for marijuana. That incident did not lead to K.M.'s removal because the child was left with Mother, who moved into her mother's house. Instead, K.M. was removed in 2018, after the car accident and Mother's relapse after undergoing drug treatment.

Williams testified about her communications with Father about what services would be required when he was released from prison. She said she talked to him "on a regular basis" and told him that he would be required "to do therapy and drug testing which he agreed on." Williams acknowledged that Father could not take anger management classes or attend therapy while in prison and testified that she had explained to him "that once he, you know, got into the halfway house, that he would be required to take therapy then and to finish his GED." Williams arranged for Father to engage in therapy, but he was discharged after he "didn't show or call or anything." Father passed one drug test in July 2020 but had not provided any drug-test results since then. Williams had tried to get his parole drug-test records, but the parole officer

said she could not speak to Williams until Father signed a release of records. Williams communicated that to Father several times, but he never signed the release. Williams testified that Father did not engage in therapy, complete his GED, take drug tests, sign a release for his parole records, or complete "the other things listed on his service plan, the anger management class—or domestic violence class, and the other—the other items listed." As for his videocall visitations, Williams had not gotten any reports about K.M. being upset by the visits, but she testified that Father's videocalls were "not regular, and the majority of the time it's other family members" speaking to K.M. In fact, even though the trial court had included in an order a provision limiting the videocalls to just Father, he continued to pass the phone to his relatives and to "give[] them his time. He may be on there for a few minutes, and then other family members come on to the phone."

Williams did not believe Father would follow through on court orders if he retained his parental rights. She further testified that if Father remained in K.M.'s life, "At this point I think it would end up harmful due to it not being on a regular basis. It's—it's like when he feels like it, which is not in her best interest. If he's going to be there all the time, always, it'd be a different story, but there's no consistency." She believed it would be emotionally damaging to K.M. if Father was "sporadically in and out of her life." Her primary concern about Father is that he would not be a consistent presence in K.M.'s life.

K.M. had been placed with Grandfather and Grandmother, and Williams said that K.M. was "doing fantastic" in that placement:

> My first meeting with her she was really shy. Now, we have tea parties every
> visit, and she is now going to school, and she is now telling me she's ready for
> high school. She's very pleasant. She engages everybody. . . . [S]he gets along

8

well with the family. She has her days to where she can be, you know, a little bit rambunctious, and she gets her reminders from her grandma. But she's just doing really well. She's the happiest little girl I've ever seen. She loves everybody. She speaks to everybody. She's just doing really good.

Williams believed it was in K.M.'s best interest to stay in that placement "because she's made, you know, growth. She's stable. She feels safe, and—and they—she's spoiled. Yes, she's spoiled, but I feel that where she's at is in her best interest."

Mother testified that during the five-year relationship she had with Father, "[t]here were multiple situations where [Father] would hit me" or yell or curse at her. He would "get in my face, just very disrespectful towards me, and [K.M.] witnessed some of those things." Mother testified that he hit her while she was pregnant with K.M. and again when K.M. was about eighteen months old, punching Mother in the face while she held K.M. in her arms. Mother testified that she took K.M. to see Father in prison about once a month for four or five months and explained that "[a]t that point in time," she thought it was important for K.M. and Father to have a relationship:

I mean, basically my decisions were blurred. I wanted to give him a benefit of the doubt, and, you know, I'm the type of person that I always believe somebody can change, and it just got to a point where he proved that—that that was never going to happen. I mean, I—I was young. I was dumb. I was a young single mother that, you know, of course wanted my family, but then came to the realization that it just—it was not beneficial for myself or my child.

Mother said that the relationship "came to be very, very toxic," and that she decided she "had to leave with [K.M.], and that's when we moved up here with my dad and my stepmom." She testified that leaving Father and moving away had been good for her: "I've gained a backbone and I've—I've learned and—and turning into the mother and the person that I

9

strive to be." She said if she had stayed in the relationship, K.M. would be "a different kid," explaining:

> When me and [K.M.] first moved up here with my dad, my dad and I have a very strong relationship, as well as me and my stepmom, and [K.M.] was pretty much terrified of men when we first moved up here due to her father and I's situation. Me and my dad couldn't even play around without [K.M.] breaking out in tears begging, Please don't hurt my mom.

Mother testified about the 2017 incident, saying that on the morning in question, she had been unable to reach Father's mother, who was supposed to babysit. Mother therefore woke Father as she left for work at about 6:30 a.m. At about 10:00 a.m., Mother received a call saying that she needed to come home because Father was being arrested and the Department was on the way. When she arrived at the apartment, she learned that Father had been found unresponsive with K.M. "on top of the table where there was a knife in her reach." There was also a bong and methamphetamine residue in reach of the child, none of which was present when Mother had left that morning. Mother said that although Father admitted to using methamphetamine, "[h]e never did admit to me using around or in [K.M.'s presence], but, I mean, how do you explain a one-year-old testing positive for methamphetamine."

Mother further testified that in June 2020, she was driving past Father's grandmother's house when some of Father's relatives started yelling insults. Mother said she "stopped to say, you know, Hey, leave me alone. I'm not doing nothing to you. Leave us alone, and I was pulled from my car, and [Father] held me down while his sisters attacked me." As a result, Mother said, she suffered a black eye, large bruises on her leg and arm, and a cut on her face, and she offered into evidence photographs that she testified were of those injuries. Mother disputed Father's assertions that he had only held her down at Mother's mother's urging and that

10

he did not see any injuries. Mother was asked why she chose to drive past Father's family's house despite earlier threats by his relatives, and she said that "it was poor judgment on my end, and it was a bad decision that I made. I'm not going to try to justify that. I—I—I just didn't think at that time, and nor did I think that there would be an incident happen like that."

Mother testified that K.M. "is very well taken care of" by Grandmother and Grandfather. Further, Mother said, "She's going to school. She's blossoming. She's very smart. She—I have no objection as to where she's at." Even if Mother regained custody, she said, she would not move K.M. "because she just started school. She's minutes away from her school. She's comfortable. I don't want to disrupt or confuse her in any type of way." Instead, Mother testified, she wanted to "build where she's comfortable with me before I full-on just rip her from her comfort zone." Mother had completed eight months of therapy and testified that she had learned a lot in that work, including how to recognize patterns surrounding domestic violence and how to place her and K.M.'s interests ahead of pressure from family members.

Mother did not want Father to have contact with K.M., saying that the child knows that Father is her "dad, but she doesn't know him." Mother thought it was in K.M.'s best interest for Father not to be in her life at all, testifying that his sporadic presence in K.M.'s life would "[a]bsolutely" increasingly affect her as she gets older and "will affect her emotionally and mentally. I mean, she'll be confused. You know? She doesn't know what a father is because of him." She believed that Father's "anger issues" would affect K.M. and testified that he or his family members had asked K.M. inappropriate questions, such as "when she is going to go see them." Mother said that kind of question was "confusing" to four-year-old K.M. because "[s]he doesn't know anything like that." Mother said Father "doesn't know how to be a parent. He never has been, in her entire four years of life, even before this."

11

Grandmother testified that K.M. had been with her and her husband for about a year and a half and that K.M. was "amazing, bright, cheerful, energetic, loves life." Grandmother was committed to keeping K.M. and intended to follow the court orders about her care. Father had never asked Grandmother for an in-person visit, and she had observed all of Father's fifteen- or twenty-minute videocalls, in which he would talk to K.M. for only about five minutes and then would spend the remaining time passing the phone to his mother or sisters, even after the court order instructing him not to do so. K.M. is "happy for the phone call" but "gets energetic when somebody calls her regardless of who they are." Grandmother testified:

> [K.M.] never talks about [Father]. Doesn't know who he is except when he calls. Struggles a lot of times saying "I love you" back. She'll look over at me because he'll say, I love you. I love you. I love you, and she'll go, I love you, like she doesn't know him. Doesn't at all. First couple phone calls were very, very difficult because she didn't know him. Now, it's like, My friend's calling. That's what she knows it is.

Grandmother was asked what she thought was in K.M.'s best interest, and she said:

> Ma'am, she doesn't need the confusion. When we first got her, she was a rock. She was silent, quiet, didn't interact, very confused and scared all the time. Anything that changes her routine is very upsetting to her. She is very—she just works so well on a schedule and what she knows and feeling safe. Every night we focus on feeling safe, reading books, hugging her, contentment, love. That is all my husband and my focus ever is is love continuously, and she just doesn't need the upset in her life.

The Department asked the associate judge to take judicial notice of the case file, to which no one objected, and the judge stated she would "take judicial notice of all the filings" and that she had "a bunch of permanency reports I need to read" before reaching a decision. The associate judge later signed an order terminating Father's parental rights.

12

Father requested a de novo hearing, which was held on November 2, 2020. At that hearing, the district court stated that it was taking "judicial notice of the prior testimony" and heard further testimony by Father and Williams. Father testified he had not had a videocall with K.M. since the hearing before the associate judge about a month earlier: "I tried to call her. There [sic] were messy and short. I don't mean to say names but [Grandmother] and them were playing with her, and she didn't want to talk to me or nothing like that." He admitted that he did not use all of the time during his videocalls, explaining that "she's got grandmas and uncles down here that would like to talk to her, too, that she lived with for almost a year and a half of her life." Father admitted to making derogatory posts about Mother on his social media page, denied that he ever hit Mother while she was holding K.M., and insisted that Mother was lying when she alleged he had held her down while his sisters hit her. Asked again about why he did not arrange to have in-person visitations with K.M., Father said, "I had tried to tell my parole officer about it, and she had told me that I could but she'd rather for me to wait because she's going to take off my ankle monitor. I got my ankle monitor removed two days ago, three days ago." He testified that he had explained the situation to his caseworker but that she "barely answers" and said it was hard to attend teletherapy sessions because he works six days a week and has parole obligations. Father believed it was in K.M.'s best interest for him to remain part of her life because "she knows who I am, she knows that I'm her dad, and that's never going to change. They're trying to keep her away from me. It's not just hurting me; it's hurting her."

Williams testified that Father never signed a parole-records release and "stated that he forgot"; that he had not complied with his service plan, explaining that he had stopped doing teletherapy; that he had not finished his GED or paid child support; and that his videocalls with K.M. "just kept getting shorter and shorter, or he would forget to do them." She also said

13

that when she spoke to Father about in-person visitations, he "stated he was on an ankle monitor, and I had tried to get in contact with his parole officer for his visits, but he stated that he forgot to tell her." Williams reiterated her belief that termination was in K.M.'s best interest.

Following the de novo hearing, the district court signed a final order terminating Father's rights. The court found that Father had constructively abandoned K.M. and had failed to comply with a court order that established the actions necessary for him to regain custody after she was removed for abuse or neglect. *See* Tex. Fam. Code § 161.001(b)(1)(N), (O). The court also found that termination was in K.M.'s best interest. *See id.* § 161.001(b)(2).

## DISCUSSION

On appeal, Father raises five issues. He asserts that the associate judge erred in taking judicial notice of the case file; that the temporary order issued after the adversary hearing was void as to Father because the trial court, at that time the associate judge, did not have personal jurisdiction over him when the order was signed; and that the evidence is legally and factually insufficient to support the district court's finding of statutory grounds under (N) or (O) and its finding that termination is in K.M.'s best interest.

*Judicial Notice*

In his first issue, Father argues that the "trial court erred when it took judicial notice of the court's file, specifically, when it took judicial notice of allegations a caseworker made in permanency reports that are not subject to judicial notice." In making this argument, Father notes that the associate judge stated at the conclusion of her hearing that she had "a bunch of permanency reports . . . to read" before she sent out her ruling, and argues that "Permanency Reports are not court orders and therefore any allegations made by a CPS caseworker about a

14

parent's service plan and the parent's compliance or lack thereof are not subject to judicial notice" but that the judge's statement "indicated that [she] would review reports that had not been admitted into evidence at trial before a ruling would be made." As support, Father cites cases establishing that a court may take judicial notice of the pleadings, other filings, or orders contained in its file but may not "take judicial notice of the *truth* of allegations in its records." *Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508 (Tex. App.—Austin 1994, no writ); *see In re E.W.*, 494 S.W.3d 287, 296 (Tex. App.—Texarkana 2015, no pet.); *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.).

Initially, we note that Father did not object to the associate judge's reference to permanency reports. *See* Tex. R. App. P. 33.1(a) (to preserve error for appellate review, record must show complaint was made to trial court by timely and sufficiently specific request, objection, or motion); *In re N.T.*, 335 S.W.3d 660, 669 (Tex. App.—El Paso 2011, no pet.) (failure to object to referring court's intent to review transcript from associate judge's hearing waived any error). That aside, and even assuming that the record established that the associate judge took erroneous judicial notice of the truth of the allegations contained in the permanency reports, Father requested and was granted a de novo hearing before the district court.

"A de novo hearing 'is a new and independent action on those issues raised' in the request for a hearing." *In re R.R.*, 537 S.W.3d 621, 622–23 (Tex. App.—Austin 2017, no pet.) (quoting *Attorney Gen. v. Orr*, 989 S.W.2d 464, 467-68 (Tex. App.—Austin 1999, no pet.)). Therefore, the party with the burden of proof, even if it prevailed before the associate judge, is still required to carry its burden in the de novo hearing before the referring court. *Id.* (quoting *N.T.*, 335 S.W.3d at 669). The family code provides that in considering the issues raised in the de novo hearing, the referring court may "consider the record from the hearing before the

15

associate judge," in addition to any witness testimony presented by the parties at the hearing. Tex. Fam. Code § 201.015(c).

The district court held the de novo hearing in November 2020, taking judicial notice of the testimony heard by the associate judge, as authorized by the family code, *see id.*, and hearing additional testimony by Father and Williams. Even if the associate judge's reference to permanency reports could be viewed as establishing error at the *associate judge's hearing*, there is no indication in the record that the *district court* took judicial notice of the truth of the Department's allegations contained in the case file. Father has not shown that error by the associate judge, if any, carried over to the de novo hearing that resulted in the final order of termination. We therefore overrule Father's first issue on appeal.

*Temporary Order and Sufficiency of the Evidence of Failure to Comply*

In his third issue, Father argues that the temporary order signed after the adversary hearing held on May 13, 2019, was void as to him because the court did not yet have personal jurisdiction over him. Thus, he argues in his fourth issue, the evidence is legally and factually insufficient to support the district court's finding under subsection (O) that he had failed to comply with a provision of a court order that established the actions necessary to obtain the return of K.M. *See id.* § 161.001(b)(1)(O).

At the time the Department filed its original petition, Father was incarcerated. In the order granting the Department emergency conservatorship, signed May 8, 2019, the court set a full adversary hearing for May 13. On May 21, the trial court received Father's pro se answer—a letter dated May 15 stating that he had just received the notice of the adversary hearing, that he did not want his rights to be terminated, that he was willing to take classes or "to do whatever," and that he wanted to be appointed an attorney.

16

An attorney was appointed to represent Father on June 24, 2019. That same day, the associate judge signed its temporary order following the May 13 hearing. The order stated that Father had been personally served but had not been notified of the hearing and had not appeared. Father was not ordered to pay child support at that time but was ordered to complete a psychological or psychiatric evaluation, engage in counseling sessions, complete a parenting class, submit to a drug and alcohol dependency assessment, and complete a substance abuse treatment program, if recommended by the assessment. Father was not granted visitation "until further order of the court," but the temporary order also provided that any visitation would be allowed only after the parent provided three consecutive clean drug tests and that visitations would cease if the parent skipped or failed a drug test or provided a diluted specimen.

After signing the June 24, 2019 temporary order, the court also signed:

- A July 16, 2019 Status Hearing Order providing that "all previous orders issued by this Court shall continue in full force and effect" and that the service plan "filed with the Court attached to this order and incorporated herein by reference" was approved and made an order of the court. The Department's status report, filed with the court on July 15 and presented to the court "for hearing," includes a Family Plan. In the Family Plan, the Department noted that Father was incarcerated and stated that he should check with the prison for assistance with classes. Father was required to continue to work on his GED, to notify the Department upon his release, and to enroll in a "drug course," "anger management or domestic violence course," and parenting classes while in prison.

- An October 15, 2019 Initial Permanency Hearing Order providing that "the plan of service for the parent/parents, filed with the Court or attached to this order and incorporated herein by reference as if the same were copied verbatim in this order, is APPROVED and made an ORDER of the Court."

- A February 4, 2020 Permanency Hearing Order stating that the court had reviewed service plans, permanency reports, and other information submitted to determine the child's safety and needs and providing that "the plan of service for the parent, filed with the Court or attached to this order and incorporated herein by reference as if the same were copied verbatim in this order, is APPROVED and made an ORDER of the Court."

- An April 22, 2020 Pre-Trial Hearing Order Before Final Order providing that: Father, who had appeared after being released from prison, was granted telephone visitations on

17

Wednesdays; Father could contact K.M. on her birthday in May; and all previous orders would continue in full force and effect except as modified.

- A September 18, 2020 Permanency Hearing Order signed after a permanency hearing held on July 7, 2020, which provided that Father could have one in-person visit per week and ordered him to immediately sign a release allowing the Department to speak to his parole officer. The service plans "filed with the Court or attached to this order" were "made an ORDER of the Court" and previous orders were continued except as modified.

- An October 6, 2020 Permanency Hearing Order signed after a hearing on September 1, 2020, which ordered that Father's telephone visits should be five minutes long and that no other persons could participate in the calls. The service plans "filed with the Court or attached to this order" were "made an ORDER of the Court" and previous orders were continued except as modified.

In addition to those orders, the record contains the following testimony relevant to

Father's compliance with court orders:

- Father testified that he had been ordered to pay child support and undergo a psychological evaluation and admitted that he had not done either, asserting that the Department was supposed to schedule his psychological evaluation.

- Father testified that he knew he was supposed to engage in counseling, that he had attended three sessions, that he never called his therapist back after he lost his phone, and that he had been discharged for failure to attend. However, Father said he did not know he had been ordered to take an anger management class.

- Father knew he could seek in-person visitation but never sought to do so because he was wearing an ankle monitor for parole. He said he never asked his parole officer for permission to visit K.M. and instead decided to wait until the monitor was removed in October 2020.

- Father knew he was required to sign the parole-information release but admitted he had never done so, explaining that he forgot.

- Father sometimes missed his Wednesday videocalls with K.M. because he was tired from work or forgot, and he passed the phone around to his relatives during those calls.

- Williams testified that she had regular communications with Father about his required services and that she had explained that he had to pay child support, finish his GED, engage in therapy, provide drug tests, sign the parole-information release, and take an anger-management class, but that he had not complied with any of those requirements.

18

- Williams testified that Father's videocalls were "not regular" and that "the majority of the time it's other family members" speaking to K.M., even after a court order limited the calls to Father.

The orders signed after Father filed his answer referenced and incorporated the earlier orders, including the June 24, 2019 temporary order, and explicitly incorporated the requirements in the parents' service plans. Thus, regardless of whether Father was subject to the June 24, 2019 temporary order at the time it was signed, he was subject to the later orders, which incorporated terms of the June 24, 2019 order and the Department's service plans. *See J.E.H.*, 384 S.W.3d at 869-70 (court cannot take judicial notice of truth of allegations but can "take judicial notice that it signed an order adopting the family service plan and what the plan listed as the necessary requirements" for parent to regain custody; if record is silent, "trial court may be presumed to have taken judicial notice of the records in the court's file without any request being made and without an announcement in the record that it has done so").

In addition, Father testified that he knew he had been ordered to pay child support, undergo a psychological evaluation, engage in therapy, and allow the Department access to his parole records but that he had not complied with those requirements. Williams testified to the same effect. We hold that the evidence before the district court is both legally and factually sufficient to support the determination that Father failed to comply with sufficiently specific court orders setting out the actions required for Father to regain custody. *See* Tex. Fam. Code § 161.001(b)(1)(O); *A.C.*, 560 S.W.3d at 630-31. We overrule Father's third and fourth issues.[2]

---

[2] Because sufficient evidence supports the district court's finding of grounds under subsection (O) finding, we need not consider his second issue, complaining of the finding of grounds under subsection (N). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

19

*Best Interest*

Finally, we consider Father's fifth issue, challenging the sufficiency of the evidence supporting the finding that termination of his parental rights is in K.M.'s best interest.

Father testified that he believed it was in K.M.'s best interest for him to retain his rights because he is her father. He said he had changed, was sober, had a steady job, and had gained better control of his anger. He wanted K.M. to be placed in his care and testified that they could live in his grandmother's house until he found his own place to live and that his grandmother or sister could care for K.M. while he was at work. Father had completed a parenting class while in prison but had not paid child support, completed a psychological evaluation or therapy, written letters or sent pictures to K.M., or sought in-person visitation.

K.M. is living with Grandfather and Grandmother, where she had been for eighteen months of her four years of life, and has started school. Williams, Mother, and Grandmother all testified that K.M. is happy, healthy, and thriving—Williams said K.M. is "doing fantastic," is "the happiest little girl I've ever seen," and loves everyone; Mother said the child is "very well taken care of" and "blossoming" and said she would leave K.M. in that placement even if she regained custody; and Grandmother said K.M. is "amazing, bright, cheerful, energetic, loves life." Grandmother testified that she and Grandfather were committed to caring for K.M. into the future, and Williams testified that leaving K.M. in that placement, as agreed by grandparents, Mother, and the Department, was in the child's best interest. Williams noted that K.M. had stability and felt safe in Grandmother and Grandfather's care.

K.M. had last seen Father in person about twenty months before the final hearing, in February 2019, when Mother last brought K.M. to see him in prison. Since his release from prison in April 2020, Father had been granted fifteen-minute videocalls once a week. He

attended most of those calls but also allowed his family members to use a substantial amount of that time rather than spending most of it talking to K.M. himself.

Mother, Grandmother, and Williams testified that they believed it was in K.M.'s best interest for Father's rights to be terminated. Williams testified that she did not believe Father would follow through on court orders or would be consistent if he retained his parental rights. She believed it would harm K.M. emotionally if Father retained his rights but was only a sporadic presence in her life. Mother testified similarly, saying that K.M. did not really know Father and "doesn't know what a father is because of him" and that Father's sporadic presence would harm the child emotionally and mentally. Grandmother testified that K.M. "doesn't need the confusion" or the "upset" of Father's ongoing presence in her life.

We must also consider that after the 2017 incident, K.M. tested at high levels for methamphetamine, although Father insisted that a doctor had told him that her positive test was due to "skin to skin" contact. Father had a negative drug test soon after his release from prison but did not take ongoing tests for the Department or sign the form that would have allowed the Department to see his drug tests taken for parole. Father had been arrested in the past for domestic violence, and Mother accused him of committing violence against her—punching her while she was pregnant and again while she was holding the child and holding her down while his sisters beat her several months before the hearing, although Father denied those allegations. Mother testified that K.M. would have been emotionally harmed had Mother not left the relationship with Father.

When we consider the evidence in light of the applicable non-exhaustive *Holley* factors: the child's emotional and physical needs, emotional or physical dangers posed to the child, the parenting skills of those seeking custody, programs available to assist those individuals

21

to promote the child's best interest, plans for the child's future, the stability of the proposed placements, and the parent's conduct that might show an inappropriate parent-child relationship and any excuses for such conduct, *see C.H.*, 89 S.W.3d at 27, we conclude that the evidence is sufficient to support the district court's determination that termination is in K.M.'s best interest. K.M. has a close, bonded relationship with her grandparents, feels safe with them, and has stability in that placement. She is doing well in school and thriving. Father has little relationship with the child, in large part due to his own conduct, which resulted in his imprisonment for two years of the child's short life. *See In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *8 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) ("The trial court could also consider the emotional danger to B.S.W. in continuing a relationship with a mother who would come in and out of her life because of drug use or incarceration, disrupting any permanency or stability for B.S.W."). He had not taken advantage of the opportunity to have in person visits to try to build a closer relationship. Although he had obtained stable employment, he had not paid any child support. *See id*. Father had completed a parenting class but did not complete an anger management class, a psychological evaluation, or counseling, nor did he provide negative drug tests. Finally, Father has a history of drug use, which resulted in K.M. testing positive at high levels for methamphetamine when she was eighteen months old, and a history of domestic violence, both of which harm a child's well-being. *See In re J.I.T.P*., 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment.").

On this record, we hold that there is sufficient evidence from which the district court could have formed a firm belief or conviction that termination of Father's parental rights is in K.M.'s best interest. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("While the recent

22

improvements made by Timothy are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."). We overrule Father's fifth issue.

## CONCLUSION

Having overruled Father's issues, we affirm the district court's termination order.

_____
Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   April 14, 2021